## James Y. Marshall, Appellant, *v.* Emanuel Hershey.

*Waters—Diversion of water—Res adjudicata.*

In an action of trespass by a lower against an upper owner of lands on a stream to recover damages for diversion of water, plaintiff testified that about twenty-four years before the litigation was begun water had been diverted to defendant's mill by a race, and that plaintiff received water through the embankment by a wooden pump stock with a bore of two and one half inches, which at times furnished a sufficient supply; that this pump stock had been removed ten or twelve years before the trial; that after its removal plaintiff obtained his supply of water by means of a ditch, and that defendant had finally shut off the supply altogether. Plaintiff obtained a verdict, after which defendant opened the ditch, and a few weeks later closed the ditch and placed a pump stock with a bore of two and one half inches through the embankment. In a second action defendant offered in evidence plaintiff's testimony in the first action, and claimed that he was furnishing water according to the standard set up by the plaintiff. It appeared that the supply which plaintiff received through the pump stock was entirely inadequate for his needs. *Held*, that there was nothing in plaintiff's testimony, on the trial of the first action to justify the trial judge on the trial of the second action, in submitting to the jury the question whether plaintiff had set up a standard by which the water should be measured out to him through a two and one half inch pipe.

Argued Feb. 7, 1878. Appeal, No. 215, Jan. T., 1897, by plaintiff, from judgment of C. P. Chester Co., Oct. T., 1896, No. 6, on verdict for defendant. Before WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Trespass to recover damages for diversion of water.

The facts appear by the opinion of the Supreme Court, and by the charge of WADDELL, P. J., which was as follows:

As you have understood, this is a second controversy between these same gentlemen, growing out of a difficulty between them

connected with a stream of water that is supposed to pass through both their properties. As we have already said in your hearing, in the judgment of the court the first suit between them, which was tried about a year ago, settled Mr. Marshall's right to have as much of this stream as was necessary for his domestic purposes, and for the purposes of his farming operations. That is the matter that was settled between them in that controversy, and we cannot gainsay it in this. [This jury will understand and take it as the court states it, that as far as the rights of these parties are concerned relative to this water, Mr. Marshall was entitled to have of the stream which Mr. Hershey claims to own just as much as was necessary for his domestic purposes and for the purposes of his farming operations. Now such a claim, as you will see, and such a result, leaves everything uncertain.] [7] If a gentleman complains that his neighbor, by the erection of a dam, is backing the water on him and thus doing him an injury, and the controversy results in a suit, and the plaintiff gets a verdict from the jury in his favor, it simply settles the question that the water is dammed back upon him to his injury.

Then it becomes the duty of the defendant to reduce his dam. How much is not settled. The jury did not determine whether it was to be an inch or a foot. They simply determine that the dam is too high. He removes a portion of his dam. If it does not suit the neighbor his only remedy is to sue again, and if the second jury's verdict is for the plaintiff it still establishes the fact that the dam is too high, but does not say how much, and it is the duty of the defendant again to reduce his dam. And so one suit follows another, until a jury determines that the dam is where it ought to be, and there is no more backwater. Thus you see a controversy of that kind results in nothing definite, and so it would be here. Mr. Marshall, in the first suit, claimed that Mr. Hershey was taking all this water, was taking more than he ought to take, and the jury so found; and therefore they determined that Mr. Marshall had a right to some of this water. But how much? The court instructed the jury that he was entitled to have just as much as was necessary for domestic purposes and for the use of his property. That is a right that every man has who has a stream of water passing through his land, and his neighbor cannot de-

prive him of it. The neighbor above cannot consume all the water unless his necessities require it. If his domestic needs or the use of his stock require that they should drink up and use up all the water, that he has a right to do, and the neighbor below cannot complain. But he cannot divert it, he cannot use it for some other purpose and thus deprive the neighbor below. But we instructed the jury upon that trial, as you have heard, that Mr. Marshall was entitled to just as much of this stream as was necessary for his domestic purposes and for the use of his farm. But, as we have said to you, the verdict under those instructions would settle nothing except that he was deprived of that right. Now if two gentlemen entering into a controversy see fit to agree that the jury shall designate how high the dam shall be, or to what point the water shall come, they may do so, and then the jury would be justified in fixing something definite. But, nothing of that kind, of course, was done here. But the allegation on the part of this defendant is that Mr. Marshall did designate how much water was necessary for his domestic purposes and how much for his farming purposes ; that when that suit ended Mr. Marshall had fixed his right in this way. [If that is so, if Mr. Marshall did so fix his rights, then he is bound by it. If he said in the course of that trial that it takes so much water to comply with my rights, then he is bound to adhere to that. And the question here submitted for your consideration is whether he did so designate.] [8] If he did not, then the whole question is open for you to determine whether or not he gets as much water now as is necessary to satisfy his domestic purposes and his farming purposes. [But if he fixed what was necessary for those purposes, and Mr. Hershey supplies him with that amount of water, then he cannot recover, in the estimation of the court, from this defendant.] [9] Did he thus fix his rights ? That will depend, as you have heard, upon what took place upon the former trial.

Mr. Hayes has called your attention to what occurred on that trial ; he has read you the statement which they filed, and there is nothing in the statement which fixes it. Mr. Marshall did not say when he brought the suit that he was entitled to so much water, and therefore he did not set it out in his statement. But did he say so in the course of the trial, before the verdict was rendered ? That will depend upon what took

place at the time of the trial.   Mr. Hayes has called your atten-
tion to some matters connected with Mr. Marshall's testimony,
in addition to reading to you the statement which was filed in
the case.   I do not know that it is necessary for me to repeat
what he has so lately read in your hearing, but probably there
will be no objection to it, and it will probably impress your
minds better.   Mr. Marshall, you will understand, is now tes-
tifying in the former case.   He was on the witness stand as a
witness, and counsel were directing his attention to what they
wanted to know.   Mr. Parke was counsel for Mr. Hershey in
that suit, as he is in this, and he was cross-examining Mr. Mar-
shall, the plaintiff here.

By Mr. Parke: " Q. Let me ask you if this is the dividing
line between Emanuel Hershey and John Wagner's property
now, what was William Wagner's property, was there any time
when that stream did not go around in that way with some
water in it?   Is this a new stream?   A. No, not around that
bend it is not.   Q. Is that old?   A. They claim that to be old,
one hundred years old."

This is in relation to the stream that passes down to the mill.

" Q. You say this course of the stream there is one hundred
years old?   A. I do not know that.   Q. How long have you
known it?   A. Ever since I have been there.   Q. For twenty-
four years?   The date you went there was 1872, and for twenty-
four years that has been the course of this stream?   A. A
portion of it.   Q. What portion?   Do you claim to have a
right to take it off at this point?   A. I claim enough water
to run across my property.   I think the streams ought to con-
nect together, that they ought to connect down at the other
stream.   Q. What do you mean by the streams ought to con-
nect together?   A. There ought to be two ends to the creek.
Q. Where would you have it connect?   A. Where the natural
place is, down at the other mill dam, away down below.   It is
not marked down here."   (Referring to the draft, I presume.)
" After it passes down to the mill it goes away down here.
This stream comes down here after it leaves me, through my
property, through Martin's property, and down here.   I claim
it ought to run all the way through.   Q. You think this stream
ought to divide here?   A I do not know whether it ought to
or not.   I do not know what they ought to have.   I claim I

ought to have water in the stream. Q. You do not undertake to say that the water has not always passed around there and gone down in that direction? This is not a new channel? A. When the water breaks over it comes here."

In the course of his examination some conversation seems to have taken place between the court and counsel interested in the cause, and upon that arising, Mr. Parke, as counsel for Mr. Hershey, says: "My contention is that here is a right of Emanuel Hershey to receive this water at some point here, and discharge it at some point here, fixed by time immemorial right or by grant."

The Court: Does that make any difference to Mr. Marshall?

Mr. Parke: Yes. I am contending that Emanuel Hershey has a right to have all this water discharged at that particular point; not any going down through Marshall, not allowing it to percolate.

The Court: What have we to do with whether he enters at John Wagner's lot or some place else?

Mr. Parke: I claim Emanuel Hershey has a right to put the water off of him where it always has gone off. I am asking James Marshall if it has not been, after being straightened, discharged in the old channel. In other words, he straightened a crooked stream on his own property. He caught the water where it came on him and discharged it where it always went off. If he has done that there is no claim by the plaintiff. I am not carrying into this case any rights John Wagner has.

The Court: I do not understand there is any complaint on the part of the plaintiff that he has not done that thing. I understand the complaint is that he has affected this connecting point. That is, Mr. Hershey has affected the connecting point.

William M. Hayes: We claim to have the right to always have running water through our place, through this natural stream, and they have no right to cut us off from having as much running water as we need at all times.

Mr. Parke: They do not designate the amount of water. They do not designate, you will see, the amount of water that is necessary to do this.

The Court: A man has a right to just as much water through his property as is necessary for domestic and farming uses.

Mr. Parke: If he has ever acquired that right. That is a legal suggestion which he makes to the court.

The Court: All the question here, it seems to me, is whether or not that has existed within the last twenty-one years, whether Mr. Marshall has not enjoyed that at any time within twenty-one years. I understood you were trying to show by evidence the condition of things, and I wanted to know what condition he found that in when he went there, and if he has continued that way since, and if not what alterations have been made.

Now Mr. Hayes calls your attention to this controversy, in connection with the testimony of Mr. Marshall, in addition to the statement here filed, to show that Mr. Marshall on that trial claimed to have a continuous stream of water through his property. Now there cannot be any question, probably, about that. That was his claim. But the question presented for your consideration is, did Mr. Marshall, in that examination, designate what was necessary and what would produce a continuous stream through his property? In order to show that the defendant calls your attention to Mr. Marshall's testimony in connection with that allegation.

William M. Hayes: "Q. When you bought that property did Hershey own the property above."

This is the continuation of Mr. Marshall's testimony on the former trial. I have omitted considerable between this and what I just read, because my attention has not been called to it, or yours either, and we therefore suppose it is not relevant to this inquiry.

"A. No. Q. When did Hershey come there? A. I could not just tell. Maybe Mr. Hershey has had it about twelve or fifteen years. Q. Was the wooden trunk in when he came there? A. Yes. Q. That had a bore of about how many inches?"

That is not the wooden trunk, you will understand, that is there now. That is the wooden trunk which was in there ten or twelve years ago, Mr. Marshall says, when Hershey came there.

"A. I think about two or two and a half, something along there, a regular bore for a pump. Q. Up to the time Hershey came there did the water run through that wooden trough or pipe? A. Yes, sir. Q. And was the water running through you then constantly? A. Yes. I never allowed it to get dry. I never allowed them to stop the hole."

By the Court: " Q. We want to understand whether or not that bore in that log furnished you with all the water you needed? A. It would. It did at times. Understand they did not leave this."

That is, as I understand it—you will say whether I am correct—that they did not leave the hole that way all the time.

" Q. We are talking about when Mr. Hershey came there, when you had this log in the two or two and one half inch bore. A. Yes. Q. Mr. Hayes wants to know whether or not with that log in, and that bore in, there was water enough coming through to supply your wants? A. Part of the time there was and part there was not."

William M. Hayes : " Q. What was the cause when there was not? A. The water would not run through my place. Q. Was the bore stopped up? A. Yes. When the bore was kept open it would run down always a constant stream. Q. Was that ever stopped up purposely or by accident? A. Purposely, I think. Q. Before Hershey came? A. Yes. Q. How was it stopped? A. Sometimes by putting sod in it, and at one time it had another piece of wood fitting in it to make it smaller. Q. When it would get stopped up, either by sod or a piece of wood, you would take it out? A. Yes, or send somebody to cut the end off. Q. Then when it came through that it would come through you? A. Yes. Q. How soon after Hershey came did he take that log out? "

Then he goes on to inquire into that.

[Now, gentlemen, in that testimony did Mr. Marshall fix a standard? That is, did he designate an amount of water coming through the pipe that would supply all his wants for domestic purposes and for the uses of his farm? If that is what he did, taking his testimony all together, if that is what he did, then he must abide by that standard, in the estimation of the court. If, in other words, he meant by this testimony that a bore, or a pipe two or two and one half inches in size would supply all his wants, then that is the standard which he has fixed.] [10] Now you will say whether or not Mr. Marshall at that time fixed a standard; did he give this defendant a standard which he could go by; whereby he could be supplied with a sufficient stream of water through his property? If he did, then as I have said to you, in the estimation of the court, he is

bound by that standard; and if this defendant has supplied him with that amount of water; has complied with that standard; then Mr. Marshall cannot complain, and the defendant cannot be held responsible. [Now it may be that Mr. Marshall is mistaken in this particular, but I do not think we have anything to do with that. You will say whether he fixed that standard; as I have said to you before.] [11] If two gentlemen get together and fix it, or say to the jury they may fix the height to which a dam may be placed, and they fix it, then they are bound by it. They have got to live up to that. Nobody can go back on that, and it makes no difference whether they are mistaken or not. That is the standard which they have fixed, and they must comply with it. If Mr. Marshall fixed the standard, then I say he is bound by it. You will say whether or not he did fix that standard. If he did not then you will say whether or not he is now getting his rights. If there was no standard fixed then we say to you that he is entitled to have as much water as is necessary for his purposes; and if no standard was fixed you will say whether, under the testimony in this case, he is getting that. But if there was a standard fixed then you will say whether Mr. Hershey is complying with that standard and supplying him with all the water which he at that time demanded and said was sufficient for his purposes. I do not know that I can make it any plainer to you, and you will say under the testimony how this is to be disposed of. If you should find that this defendant is not doing what he should do; or, in other words, if you find that Mr. Marshall is entitled to recover in this case, then he is entitled to be not only compensated for the loss of this water, but he is entitled in addition to that to punish this defendant, because it was the duty of this defendant to comply with what the former jury demanded of him, and therefore the defendant here would be subject to what we call punitive damages; that is, such damages as would punish him for not doing what he should do. You will estimate and endeavor to determine what that amount shall be. We have no particular standard to guide you, but you will endeavor to ascertain as well as you can from the testimony how he should be punished, if he should be punished at all.

1. The court is requested to charge the jury that the present action being for the continuance of the same wrongful acts

complained of in the former action, the record of the former action is conclusive of the plaintiff's right to recover, upon showing to the satisfaction of the jury that the defendant continued to divert the water of the stream in the same way as he had previously done. The question of his legal liability cannot be retried. *Answer:* I affirm that point, gentlemen. That is a right which the plaintiff has, if things continue as they did originally when the suit was first tried. If circumstances have not changed as they then existed, the proposition of law is correct. But if the standard here has been fixed by Mr. Marshall then you will see it would change the circumstances which existed at the time of the other trial. [12]

2. The court is requested to charge the jury that the cause of action in the second suit being the same as that in the first, punitive damages may be given by the jury in this suit to compel the defendant to comply with the decision of the first suit. *Answer:* I affirm that point. As I have already said to you, gentlemen, if you should find that this defendant is liable in damages here you will be entitled to impose upon him such damages as would not only compensate this plaintiff but punish the defendant for not doing what he should have done by reason of the former verdict.

Verdict and judgment for defendant. Plaintiff appealed.

*Errors assigned* among others were (7–12) above instructions, quoting them; (14) in not having the stenographer read the entire charge of the court to the jury, when the jury came in after being out over night and requested that said entire charge should be read to them.

Upon this occasion the court instructed the jury:

Gentlemen of the jury, you request the court to read the charge again. I cannot literally comply with that request, for I have not it in writing. It is not in writing only as the stenographer has it. But perhaps I can aid you by answering any inquiries that you may make that it is proper for me to answer, without the necessity of reading the whole charge. If however you prefer that to be done we will have to ask the stenographer to read it to you. I can only read it through him. If there are any inquiries you desire to present to the court, do so, and we will see whether we can answer them or not.

*Wm. M. Hayes,* with him *J. Carroll Hayes,* for appellant.—
The former judgment having determined that plaintiff was
entitled to at least a constantly flowing stream of water through
his property sufficient for his agricultural and domestic pur-
poses, and the evidence at this trial being uncontradicted that
he had not received such a stream, a verdict should have been
directed for the plaintiff : Bolton v. Hey, 168 Pa. 421 ; Marsh
v. Pier, 4 Rawle, 289 ; Brenner v. Moyer, 98 Pa. 278 ; Rock-
well v. Langley, 19 Pa. 502 ; Schwan v. Kelly, 173 Pa. 71 ;
Myers v. Coal Co., 126 Pa. 582 ; Pennock v. Kennedy, 153 Pa.
579 ; 2 Black on Judgments, sec. 754 ; Rockwell v. Langley,
19 Pa. 502 ; Long v. Trexler, 8 Atl. Rep. 620 ; Schoch v. Fore-
man, 3 Brewster, 157 ; Smith v. Elliott, 9 Pa. 345 ; Killheffer
v. Herr, 17 S. & R. 319 ; McCoy v. Danley, 20 Pa. 90 ; Fell v.
Bennett, 110 Pa. 187 ; Ellis v. Academy, 120 Pa. 622.

Even granting that the testimony was admissible to prove
that plaintiff agreed to limit himself, there was not sufficient
evidence for the finding of such a fact.

The sole foundation of Hershey's right here to have a portion
of this stream pass around to the mill, is based upon imme-
morial prescription. The extent of his right, therefore, is meas-
ured by the extent of its enjoyment originally ; and it cannot
be changed or extended in any way : McCallum v. Water Co.,
54 Pa. 40 ; Darlington v. Painter, 7 Pa. 473.

*Arthur T. Parke,* with him *J. Frank E. Hause,* for appellee.
—Admissions which have been acted upon by others are con-
clusive against the party making them in all cases between him
and the person whose conduct he has thus influenced. In such
case the party is estopped on grounds of public policy and good
faith from repudiating his own representations : 1 Greenleaf
on Evidence, sec. 207 ; McKellip v. McIlhenny, 4 Watts, 323 ;
Bennett v. Biddle, 150 Pa. 420 ; Strickler v. Todd, 10 S. & R.
73 ; Tyler v. Mather, 9 Gray, 182.

Opinion by Mr. Justice Fell, March 28, 1898:

The judgment in a prior action between the same parties
determined the right of the plaintiff to the use of so much of
the water of the stream which ran through his farm as was
necessary for agricultural and domestic purposes. On the trial

of that action the plaintiff, whose land is below that of the defendant, conceded the defendant's prescriptive right to divert a part of the water to his mill, but he claimed that enough should be left to flow in the natural channel to supply the needs of his farm and dwelling. The defendant claimed the right to use all of the water, and had diverted all of it to his mill. The issue raised was decided in favor of the plaintiff, and his right thus established. The present action was defended on the ground that at the former trial the plaintiff had fixed a standard for the measurement of the amount of water to which he was entitled, and that he had since received all that he then claimed. Part of the testimony of the first trial was read to the jury, and it was left to them to find whether the plaintiff had at that trial fixed a standard and if so, whether he had been supplied according to his own measure.

It appeared at the first trial that the plaintiff had purchased his property twenty-four years before the commencement of any litigation concerning the water right, and that, at that time, at or near the point where the water was diverted to the defendant's mill, a wooden pump stock ten feet long with a bore of two and one half inches extended through an embankment and conducted water from the mill race to the natural channel, and that when it was unobstructed the supply was sufficient. This pump stock had been removed ten or twelve years before the trial. After its removal the plaintiff's supply of water came by means of a ditch, until it was finally shut off altogether by the defendant. Immediately after the trial the defendant opened a ditch across the embankment, which furnished an adequate supply, but a few weeks later he closed this ditch and placed a pump stock with a bore of two and a half inches through the embankment, and then claimed that he was furnishing water according to the standard set up by the plaintiff for the measurement of his right, although the amount thus furnished was insufficient for the plaintiff's use. In fact, at times, there was not enough thus furnished to reach the plaintiff's property.

By the statement filed in the former action the plaintiff did not limit his right but claimed the natural flow of the stream. At the trial he conceded the right of the defendant to divert a part, but he distinctly asserted his right to have at all times an

uninterrupted flow of water sufficient for his needs.   Whether he had this right was the question submitted by the charge and decided by the verdict and judgment.   The plaintiff had shown that a part of the stream had passed in its original channel through his property immemorially until the defendant had diverted all of the water.   In describing the condition of the stream when he first took possession of his property, twenty-four years before, he spoke of the pump stock by means of which the water was conducted from the mill race, and of its removal and the substitution of a drain for the same purpose, and said that the supply had always been sufficient unless the stock or drain became obstructed.   This was in support of his claim of a right to have enough water, by showing that an uninterrupted supply had always been furnished ; and nothing that he then said can be construed as limiting the right which he asserted by setting up a standard by which the water should be measured out to him through a two and one half inch pipe.   The uncertainty of such a standard, as to both the quantity and sufficiency of the supply, is manifest.   The quantity of water that would pass through the pipe would depend on the head of water in the mill race and the inclination of the pipe, and its position in relation to the current, and a quantity sufficient during a wet season might be insufficient during a dry one.   We speak only of the testimony of the first trial which was introduced at the second, as it is all that the record presents.   In this we find nothing which justified the submission of the question to the jury.

The assignments of error from the eighth to the fourteenth inclusive are sustained, and the judgment is reversed with a venire facias de novo.